# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA K. COLLINS, | ) 1:08-cv-0271 GSA |
| | ) |
| | ) |
| | ) ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) SOCIAL SECURITY COMPLAINT |
| | ) |
| v. | ) |
| | ) (Docs. 18, 19, and 20) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Sandra K. Collins ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On August 1, 2008, the action was reassigned to the Honorable Gary S. Austin for all purposes.

1

**FACTS AND PRIOR PROCEEDINGS**[2]

2   On or about August 13, 2001, Plaintiff filed applications alleging disability since July 26,

3   2001, due to depression, bipolar disorder, congestive heart failure, asthma, hypertension,

4   diabetes, sleep apnea, fibromyalgia, and severe neck and back pain. AR 22,118-120. Her

5   application was denied initially and on reconsideration, and Plaintiff requested a hearing before

6   an Administrative Law Judge ("ALJ"). AR 62-65, 67-71,72. ALJ William C. Thompson held a

7   hearing on January 29, 2003, and issued an order denying benefits on April 25, 2003. AR 40-54.

8   862-895. On August 5, 2004, the Appeals Council vacated the ALJ's decision and remanded the

9   matter back for a new hearing with instructions to allow the submission of evidence related to

10  Plaintiff's mental limitations. A.R. 93-97.

11  Pursuant to the Appeals Council's order, ALJ William C. Thompson held a second

12  hearing on October 12, 2005, and again issued an order denying benefits. AR 21-35, 896-919.

13  On December 26, 2007, the Appeals Council denied review. AR 5-7.

14  Hearing Testimony

15  ALJ Williams held two hearings in Stockton, California, on January 29, 2003, and

16  October 12, 2005, respectively. Plaintiff appeared at both hearings and was represented by Omar

17  Ortega during both proceedings. AR 898.

18  Plaintiff testified she was forty-four years old at the time of the first hearing, and forty-six

19  years old at the time of the second hearing. AR 866, 899. She completed the Eleventh grade but

20  did not graduate from high school or obtain a G.E.D. AR 867, 900. She can read and write. AR

21  867, 900. At the time of the first hearing, Plaintiff was five feet four inches tall and weighed 270

22  pounds. A.R. 867. At the time of the second hearing, Plaintiff weighed 247 pounds. Plaintiff

23  indicated that she had lost weight in the interim because she was sick. AR 900.

24  Plaintiff worked in the dry cleaning industry as a presser, and on occasion as a cashier for

25  approximately fifteen years. AR 869-872. Plaintiff also worked part-time as a waitress serving

26  drinks at a bar for approximately three months in or about 1996. AR 872. Plaintiff stopped

27

28

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1   working at the dry cleaners in 2001 due to back problems, asthma, depression and swelling in her

2   legs. AR 873, 901.  Subsequently, she attempted to work for approximately two to three days at

3   SaveMart in the bakery, but stopped working when her legs swelled up and her doctor

4   recommended state disability.  AR 869, 902.  At that time, Plaintiff was depressed and suffered

5   from edema in her hands, legs, and feet.  AR 887.  Plaintiff indicated that she was not able to do

6   the job mentally and that she broke down after the third day.  AR 902.

7       At the first hearing, Plaintiff indicated that she suffers from edema due to congestive

8   heart failure and high blood pressure.  AR 876, 879, 887.  The edema is constant but it gets

9   worse once a month or two which requires her to take extra water pills.  AR 887.  When this

10  occurs, the edema does not subside for five to six days.  AR 887.  Plaintiff also suffers from

11  depression and was taking Paxil. AR 889.

12      Plaintiff testified she was not able to work due to her asthma and back pain.  AR 874, 902.

13  She used four inhalers, prednisone, cough syrup and antibiotics to treat her asthma.  AR 875.  She

14  used the inhaler four to five times per day.  She also used oxygen therapy twice a day.  AR 875.

15  Plaintiff was never been hospitalized for her asthma, however, she suffers from labored breathing

16  frequently which is exacerbated when she is ill.  AR 875, 888.

17      Plaintiff's back pain began in 1998 after she was involved in an accident in which a

18  building fell on her and she was buried.  AR 876.  Although X-rays revealed no injuries, Plaintiff

19  suffers from lower back pain and pain in her legs as a result of this incident.  AR 876.

20      Plaintiff was also diagnosed with diabetes approximately eight months prior to the first

21  hearing and was taking medication to treat that condition.  AR 876.  However, she was not taking

22  insulin and she was not on a diabetic diet. AR 877.  She suffers from fatigue which her doctor

23  indicated was due to high sugar levels. AR 878.

24      Plaintiff was able to prepare meals and do some light housework, although she was not

25  able to cook the large meals she cooked previously due to back pain.  AR 880.  She does a more

26  thorough cleaning like scrubbing the toilet or mopping the floor only when she "feels good." AR

27  882.  Plaintiff grocery shops but takes her son for assistance if she is purchasing large amounts of

28  food so that he can push the cart.  She is unable to push the cart if it is over half full without

getting short of breath and sweaty.  AR 881-882.  During the day, Plaintiff does some chores,
watches television, and plays with her dog.  AR 882.  Plaintiff also cleans out her bird's birdcage.
AR 885.

Plaintiff indicated that she would pass out if she tried to walk a block and she was unsure
if she could even walk half a block.  AR 883.  However, she did not need an assistive device to
walk.  AR 883.  She was able to stand for one hour if she was not feeling sick and stand for
twenty to thirty minutes if she is preparing meals.  AR 883-884.  She could lift ten pounds
without hurting her back but had difficulty using her hands when they swell.  AR 884.  Plaintiff
used oxygen at night because her oxygen level drops.  AR 884.  Plaintiff previously smoked two
packs of cigarettes a day but quit approximately eight months prior to the first hearing.  AR 885-
886.  Plaintiff started drinking after her divorce but stopped drinking approximately seven or
eight years ago after she received a DUI.  AR 886.

At the time of the second administrative hearing, Plaintiff testified that she had been
diagnosed with fibromyalgia and was taking Vicodin, Gabapentin, and Baclofen for pain.  AR
903.  She also indicated that she had a difficult year and had been diagnosed with bipolar
disorder, although, she didn't know what that meant, or whether she is bipolar or not.  AR 904,
912.  She was using a wheelchair and a walker for approximately three months because she
would "lose all body function" and was unable to walk.  AR 904-905.  Plaintiff still uses a
walker for long distances.  AR 904.   The doctors ran tests but could not figure out what was
causing the problem.  AR 904.  In addition, her asthma worsened and she was put on Prednisone
several times.  AR 904.  Her doctors were considering whether she had "steroid induced
psychosis."  AR 904.

Plaintiff takes Citalopram for depression and was seeing a therapist for approximately
one year.  AR 905.  However, Plaintiff no longer sees the therapist because Plaintiff had a
problem with her.  AR 905.  Plaintiff was hospitalized at Livermore hospital but she had a
problem there and left.  AR 905. She was also hospitalized on a 5150 hold at the Alto Hospital
for seven days in a psychiatric ward.  AR 906. Plaintiff continues to have difficulty walking and

uses a walker or her husband's wheelchair for long distances.  AR 906.  She is able to stand and

sit for one hour and can still do light housework.

At the time of the second hearing, Plaintiff was smoking a half pack of cigarettes a day.

AR 907.  She spends four to five hours a day in bed.  AR 907.  She has difficulty getting along

with people.  AR 908.  She mainly stays at home but continues to go to the grocery store with her

son's assistance.  AR 908.  Since the last hearing, the police were called to her house several

times and she was arrested for calling 911 too frequently.  AR 910.  Plaintiff's husband also

called 911 due to Plaintiff's erratic behavior and because she would lose "all body function."  AR

911.  Plaintiff does have one friend who she sees one time per week. AR 912.

Vocational Expert (VE) Steve Schmidt testified at both of the administrative hearings.

AR 890-893, 915-919.  At the first hearing, he classified Plaintiff's past work experience as a

presser and counter clerk at a dry cleaners as light, semi-skilled.  AR 890.  The VE was asked to

assume a worker of Plaintiff's education and work experience who can lift twenty pounds

occasionally and ten pounds frequently, can stand and walk in combination for six or more hours

a day, can sit without limit when not required to stand or walk, can occasionally bend, stoop,

twist, squat, kneel, and crawl, but should not be required to climb or work at heights or around

vibration or around hazardous moving machinery, and should not be exposed to excessive

amounts of dust, fumes, smoke or other respiratory irritants in the work atmosphere.  AR. 890.

VE Schmidt advised that this position would be a light, unskilled job, and that a cashier and

assembly position would fall into that hypothetical.  There are 90,000 and 47,000 of those jobs

available respectively.  VE Schmidt indicated that a parking lot attendant would also fall into this

category but that there would be restrictions due to the fumes.  AR 892.

In the second hypothetical, the VE was asked about a worker with Plaintiff's education

and work experience, who can still lift twenty pounds occasionally and ten pounds frequently,

who can stand and walk for a hour at a time for a total not to exceed four hours a day, who can sit

the remainder of the day without limit, and with the same nonexertional restrictions previously

given.  AR 892.  VE Schmidt testified that the previous positions would still apply, but the

sedentary level reduces the numbers to 14,000 for cashiering and 10,000 for assembly work.  AR

1   892.  The parking lot attendant job is completely eroded at a sedentary level.  AR 892.  Although

2   the job of cashier is listed in the Dictionary of Occupational Titles as a light job, the VE found

3   that based on his experience and statistical data, a portion of those jobs can be performed at the

4   sedentary level.  AR 892.

5          At the second hearing, VE Schmidt classified Plaintiff's work as a presser as a medium

6   semi-skilled job.  He was asked to assume a worker of Plaintiff's education and work experience

7   who can lift twenty pounds occasionally and ten pounds frequently, who is capable of standing

8   and walking in combination for six hours or more hours a day, and can sit without limit when not

9   required to stand or walk.  The individual should not climb ladders or scaffolding, although she

10  can climb stairs occasionally, should not work at heights or around hazardous moving machinery,

11  should not be exposed to excessive amounts of dust, fumes, smoke or other respiratory irritants,

12  is better suited for jobs involving relatively simple instructions, and relatively restricted contact

13  with the general public.  A.R. 916. VE Schmidt advised that this position would be a light,

14  unskilled job and that a assembly position or a sewing machine operator would fall into that

15  hypothetical.  A.R. 916.  There are 47,000 and 22,000 of those jobs available respectively.

16         In a second hypothetical, the VE was asked about the existence of jobs that are able to be

17  performed by a person of Plaintiff's age, educational and vocational background who is capable

18  of lifting ten pounds occasionally, is capable of moving small objects throughout the workday,

19  who is capable of standing and walking no more than thirty minutes at a time for a total not to

20  exceed two hours a day, is capable of sitting without limitation when not required to stand or

21  walk, with the same nonexertional restrictions previously listed.  AR 916.  The VE indicated that

22  this position would be a sedentary job and that a sewing machine operator would still be able to

23  be performed with no reduction in the numbers of available positions, as well as a hand packer at

24  the sedentary level.  A.R. 916-917. Although the sewing machine operator job is classified by the

25  DOT as a light job due to the use of foot petals, the VE in his twenty five to thirty years of

26  experience has seen "many sewing operator jobs and they seem to fall within that hypothetical."

27  AR 917.  When non-exertional restrictions consisting of "moderate" limitations are added to the

28  second hypothetical including an ability to maintain attention and concentration and to function

6

socially with supervisors, co-workers, and the public, the alternative jobs previously identified would be eliminated.  A.R.  918-919.

Medical Record

*Plaintiff's Medical Conditions*

Between August 7, 2000, and August 29, 2001, Plaintiff was treated by Dr. Bob Peterson for asthma, back pain, edema, hypertension, depression, AR 181-188.  Plaintiff was prescribed Paxil, Clonidine, Lasix, Avelox, Zoloft, and Flovent.  AR 185, 186, 188.  Plaintiff reported that she was unable to work because she was fatigued. AR 185.

Medical records from Modesto Advance Diagnostic Imaging Center; Med-Mart, in Modesto, California; and the Stanislaus County Health Services Agency show Plaintiff was examined for hemorrhoids and was evaluated for cardiac conditions between October 2001 through June 2002.  AR 251- 306; 409-418.

On October 12, 2001, Dr. Ralph Wood, M.D., performed a consultative examination at the request of the Social Security Administration for Plaintiff's complaints of asthma, hypertension, edema, and depression. AR 189-190.  Plaintiff reported a history of asthma for twenty years for which she was taking Prednisone and three different inhalers.  AR 189.  She also reported a history of depression and was taking Paxil and Elavil.  AR 189.  In addition, she stated that she suffered from back pain and she was taking Vicodin.  She also suffered from periodic edema and was taking Lasix.  AR 189. Plaintiff was obese with a weight of 284 pounds at a height of five feet four inches and her blood pressure was elevated. AR 189. Plaintiff's lungs were clear and she walked with a normal gait. AR 190.  There was no muscle atrophy or edema. AR 190.  She could bend over to where her fingers were eight inches from the ground, but she subjectively complained of pain.  AR 190.  Plaintiff had full range of motion in all extremities and had normal 5/5 motor strength, sensation, and reflexes.  AR 190.  Dr. Wood opined that Plaintiff could stand or walk two hours a day, lift, carry push or pull twenty pounds. AR 190.  There were no limitations in hand movements or any restriction in fine finger movements.  AR 190.

7

1   On December 21, 2001, Lon Gottschalk, M.D., reviewed the record.  AR 197-214.  He

2   opined that Plaintiff had mild to moderate work-related limitations, but could perform simple and

3   moderate instructions, and adapt to changes in a work routine.  A.R. 199.  Dr. Gottschalk found

4   that Plaintiff was capable of responding appropriately to supervisors, co-workers and the public.

5   AR 199.  He diagnosed Plaintiff with adjustment disorder with depression and anxiety.  AR 204,

6   206, 213.

7   Treatment records from Doctors Medical Center in Modesto, California, reveal that from

8   January 11, 2002, and February 23, 2002, Plaintiff was examined and tested for heart disease and

9   pulmonary function testing.  AR 223-242; 340-408.  She was examined by Dr. William Smith,

10  M.D., a cardiologist. She reported that she had used virtually all kinds of street drugs in the past.

11  She claimed that she had stopped using drugs two years previously.  AR 236.   On January 11,

12  2002, a pulmonary function test revealed mildly increased RV/TLC ratio with a normal total lung

13  capacity, marked increase in airways residence that decreases significantly with post-

14  bronchodilator, normal diffusion capacity for carbon monoxide, moderate hypoxemia, significant

15  hypercarbia, and slightly increased carboxyhemoglobin levels.  AR 239. On February 22, 2002, a

16  cardiac catheterization showed the overall left ventrical ejection fraction was 55%.  AR 226.

17  There was not any significant wall motion abnormality. AR 226.

18  On March 5, 2002, a state agency doctor reviewed the record and performed a Physical

19  Residual Functional Capacity Assessment.  AR 243-250.  He opined that Plaintiff could

20  occasionally lift and/or carry ten pounds, frequently lift and/or carry less than ten pounds, stand

21  and/or walk at least two hours a day, sit for six hours a day, and had unlimited pushing and

22  pulling abilities.  AR 243-244.

23  On February 15, 2002, Dr. Drew Logue, M.D., performed a pulmonary function study

24  which revealed mild airway construction and a significant response to inhaled bronchodilator.

25  AR 216-222.

26  On August 21, 2002, Dr. David Pong, M.D., a state agency doctor, performed a second

27  Residual Functional Capacity Assessment.  AR 307-314.  He opined that Plaintiff could

28  occasionally lift and/or carry ten pounds, frequently lift and/or carry less than ten pounds, stand

1   and/or walk at least two hours a day, sit for six hours a day, and has unlimited pushing and

2   pulling abilities. AR 308.

3        On November 18, 2003, Plaintiff was treated at Memorial Hospital.  AR 436-469.

4   Plaintiff had lost consciousness for three to five seconds.  She had been coughing, but does not

5   remember what happened next.  AR 444, 454.

6        On October 15, 2004, Plaintiff was examined by Dr. Modi, M.D., at the request of the

7   Social Security Administration. AR 469-472.   Plaintiff reported a history of back pain, asthma,

8   diabetes, congestive heart failure, hypertension, depression, seizures, leg swelling, and neck and

9   back discomfort.  AR 469.  Plaintiff reported using oxygen at night.  AR 469.  Plaintiff had

10  decreased range of motion in the shoulder, cervical, and lumbar spine.  AR 470-471.  Dr. Modi

11  diagnosed a history of asthma, increased body mass index, non-insulin dependant diabetes,

12  hypertension, depression and some cervical and lumbar arthritis.  AR. 472.  Dr. Modi found that

13  Plaintiff could stand and walk for two hours a day, sit for six hours a day, and lift/carry up to ten

14  pounds frequently and twenty pounds occasionally.  AR 472.   Plaintiff may have some postural

15  problems and can only occasionally climb balance, kneel, stoop, crouch, and crawl.  There were

16  no manipulative, visual, environmental, or communicative limitations.  AR 472.

17       Plaintiff was later treated at the Veterans Affairs Administration Medical Center

18  ("VAMC"). AR 511-573.  On April 1, 2004, Plaintiff was examined by Dr. Calvin Reckford,

19  M.D., for complaints of asthma, neck pain, low back pain, obesity, depression, possible sleep

20  apnea, edema, cramping of the lower extremities, and reports of a history of chronic obstructive

21  pulmonary disease and coronary artery disease.  AR 564.  Dr. Reckford noted that previous tests

22  for congestive heart failure were negative. AR 564.   Plaintiff was diagnosed with asthma and

23  prescribed antibiotics. AR 565.  It was noted that she previously started a Prednisone taper.  AR

24  565. On April 6, 2004, Plaintiff was treated at the VAMC Same Day Clinic ("SDC").  She

25  complained of increased back pain for the past three weeks and indicated that Robaxin and

26  Vicodin were not helping. AR 561.   Plaintiff requested more pain medication but was told by the

27  attending physician she would need to contact her primary care provider.  AR 561-563.  On May

28  12, 2004, Plaintiff was still having difficulty breathing and was prescribed Tequin.  AR 551.  Her

1   edema had markedly improved on Lasix and she was prescribed Methocarbamol for her neck and

2   low back pain.  Plaintiff was also taking Gabapentin for neuropathic pain.  AR 552.  It was noted

3   that Plaintiff was not monitoring her blood pressure or her sugar levels at home.  She reported

4   that she was smoking a pack of cigarettes a day but she was not ready to quit.  AR 552.

5      On May 28, 2004, Dr. Reckford, M.D., at the Department of Veteran's Affairs, confirmed

6   his treatment of Plaintiff for asthma, chronic lung disease, chronic neck pain, obesity, diabetes,

7   and hypertension.  AR 419.  Dr. Reckford noted Plaintiff's history of depression and insomnia

8   with poor concentration.  He opined that Plaintiff would not be employable due to the combined

9   effects of chronic psychiatric and medical problems on her functional ability.  AR 419.

10     On June 7, 2004, Dr. Thomas Yee, D.O., at the VAMC Neurology Clinic performed an

11  evaluation of Plaintiff.  AR 544.  He noted that she had not had any other seizures since

12  December 13, 2003. AR 544-545.  Plaintiff was given permission to drive.  AR 545.

13     Plaintiff was seen by Dr. Reckford on August 12, 2004, for low back pain after cleaning

14  the house. AR 538.  Dr. Reckford noted that the last lumbar x-ray was normal and that there were

15  minimal degenerative changes reflected in the last cervical spine x-ray.  AR 538.  Dr. Reckford

16  attributed Plaintiff's pain to muscle strain and gave Plaintiff exercises to tone and strengthen her

17  back.  AR 538.

18     On September 2, 2004, Plaintiff was admitted to Memorial Hospital emergency room.

19  AR 484-510.  She complained of shortness of breath, wheezing, and chest pain.  AR 484, 491.

20  She was discharged after approximately two hours when an examination revealed she had no

21  rales and her breathing was not labored. AR 487-488.

22     On November 18, 2004, Plaintiff was examined by Dr. Laszlo Vaszar, M.D., to assess her

23  asthma symptoms.  AR 678-681.  Plaintiff stated that she is short of breath after walking a half-

24  mile but had no shortness of breath when resting.  AR 678.  It was noted that Plaintiff was an

25  active smoker who smoked one pack of cigarettes per day and previously smoked two packs of

26  cigarettes for thirty years. AR 679.  Plaintiff was diagnosed as morbidly obese. AR 679.  The

27  pulmonary function test revealed a mild obstructive ventilatory defect.  AR 680.  It was

28

recommended that Plaintiff stop smoking.  Plaintiff was advised to continue using oxygen at night.  AR 680.

On November 23, 2004, Plaintiff was seen again by Dr. Reckford for complaints of low back and neck pain.  AR 674.  Plaintiff was given an injection of Toradol and it was noted that musculoskeletal problems may be due to myofascial pain syndrome or fibromyalgia.  AR 674.

An MRI of the cervical spine on January 19, 2005, showed minimal degenerative disc disease at C6-7. AR 576-577.  An MRI of the lumbar spine completed on the same day revealed mild degenerative changes.  AR 578.

On March 7, 2004, Plaintiff was evaluated by Dr. Michael Lyon, a rheumatologist, at the VAMC for further evaluation of her musculoskeletal complaints. AR 629-633.  Dr. Lyon noted that Plaintiff was morbidly obese and that there were multiple soft tissue tender points in paired fashion.  AR 632.  Dr. Lyon diagnosed Plaintiff with probable fibromyalgia which he found to be linked to Plaintiff's sleep disorder, which seemed most compatible with sleep apnea.  AR 632. Plaintiff was given an injection of Toradol and was prescribed Baclofen.  AR 633.

In March and April 2004, Plaintiff continued to experience asthma related symptoms and was treated accordingly. AR 617-629.  On April 13, 2005, Plaintiff's was told that she needed to quit smoking.  AR 619. The physician explained that the prescribed medications may not counteract the effects of smoking.  AR. 619. Plaintiff was evaluated at the Neurology Clinic on April 6, 2009, and was advised again that she needed to stop smoking.  AR 560.  Plaintiff was seen at the Pulmonary Clinic on May 16, 2004.  Plaintiff reported that she continues to smoke. AR 595.  The physician advised Plaintiff that she needed to increase her exercise tolerance.  AR 595.

On April 26, 2005, Dr. Reckford affirmed the diagnosis of asthma and fibromyalgia, and administered another injection of Toradol for pain.  AR 608-610.  On May 2, 2005, Plaintiff was seen in urgent care for exacerbation of pain and an inability to sleep which were attributed to her fibromyalgia.  AR 604- 607.  She was advised to take two additional Vicodin. AR 607.

///

///

1    *Plaintiff's Psychological Conditions*

2    On November 26, 2001, Dr. Philip Cushman, PhD., performed a consultive psychological

3    evaluation at the request of the Social Security Administration.  AR 191.  Plaintiff related

4    behavioral problems in her youth including being suspended and telling teachers off. AR 191.

5    She also reported being sexually abused between the ages of five and eleven, and was

6    "emotionally abused" by her sister.  AR 192.  Plaintiff reported having smoked marijuana from

7    age fifteen through the time of her divorce in her early thirties.  AR 192.  She drank alcohol in

8    excess for several years prior, although she had not drunk alcohol at all in the last two months.

9    AR 192.  She reported experimenting with cocaine, amphetamine, LSD and PCP in her youth,

10   but did not use these drugs regularly. AR 192.

11   Plaintiff reported that she left her job at the dry cleaners because she was she was ill and

12   did not get along with her manager.  AR 193.  She reported disturbed sleep, fatigue, and a history

13   of suicidal ideation.  AR 193.  Plaintiff indicated that she spent her day sitting on the couch

14   watching television and doing household chores.  AR 193, 195.

15   Dr. Cushman described Plaintiff as mildly anxious, moderately depressed and tearful

16   which proceeded to crying at the end of the interview.  AR 193.   Plaintiff was fully oriented,

17   could concentrate on tasks, and had intact immediate memory.  AR 194-195.  Dr. Cushman noted

18   Plaintiff had difficulties with concentration and sadness that may involve some depression .  AR

19   196.  He diagnosed adjustment disorder with mixed anxiety and depressed mood and assessed

20   Plaintiff's GAF at 55.[3] AR 195.  Dr. Cushman opined that Plaintiff was not capable of

21   performing detailed or complex tasks.  AR 196. She was capable of attending regularly but

22   would have difficulty with consistent participation due to her physical functioning and

23   subsequent dysphoria.  AR 196.   Plaintiff could perform simple and repetitive tasks and could

24

25

26        [3] The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's
     overall level of functioning.  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental*
27   *Disorders* 30 (4th ed. 2000) ("DSM IV").  A GAF between 51 and 60 indicates "[moderate symptoms (e.g. flat affect
     and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school
28   functioning (e.g. few friends, conflicts with peers or co-workers).  DSM- IV at 34.

1  get along with co-workers and the public.  AR 196.  She was not capable of dealing with the

2  usual stressors encountered in a competitive work environment.  AR 196.

3        On November 2, 2003, Plaintiff was examined by Dr. Richard Kjelson, PhD., at the

4  request of Plaintiff's counsel. AR 420-435.  Plaintiff was unable to complete a MCMI due to the

5  "severity of her anxiety and related excessive degree of difficulty with adequately maintaining the

6  stability of her concentration and thought process." AR 430.  Plaintiff reported being sexually

7  abused by an older half-brother between the ages of four and eleven.  AR 430.  Plaintiff stated that

8  she used alcohol excessively at the time of her divorce and used marijuana minimally in high

9  school but had "no further history of illicit drug use." AR 431.  She described her history of

10  physical impairments, including suffering injuries during a car accident, as well as fracturing her

11  neck when a building collapsed on her.  AR 431-432.  Plaintiff also indicated that she suffers from

12  diabetes, chronic obstructive pulmonary disease, a heart murmur, asthma, migraine headaches,

13  and very poor eyesight.  AR 431-432. In addition, Plaintiff experienced psychological symptoms

14  including feelings of sadness and hopelessness, diminished sense of self-worth, frequent excessive

15  social withdrawal, nightmares, diminished attention, cognitive and memory capacities, episodes of

16  slow paced thought, and very deteriorated capacity for experiencing any significant pleasure in

17  life. AR 433.  She had post-traumatic stress from being seriously injured in a building collapse.

18  Plaintiff reported that her husband and son carried out the majority of activities of daily living at

19  home.  AR 433.

20        Dr. Kjelson performed a mental status examination which revealed the following: mildly

21  slowed gait and motor behaviors; moderately depressed mood; moderately severe anxiety; reality

22  based thought processes; no evidence of delusions; psychoses, or suicidal ideation; low to average

23  intellectual function and general memory function; and adequate insight and judgment capacities.

24  AR 433-434.  Dr. Kjelson diagnosed Plaintiff with Major Depression and Post-Traumatic Stress

25  ///

26  ///

27  ///

28  ///

1   Disorder as a victim of physical/sexual abuse in childhood and adolescence.  He assessed her

2   GAF at 48.[4]  AR 434-435.

3        On October 16, 2004, Plaintiff was evaluated by a psychiatrist, Dr. Manolito Castillo,

4   M.D., at the request of the Social Security Administration.  AR 474-482.  Dr. Castillo reported

5   that Plaintiff had used a number of psychiatric medications but did not see any benefit from them.

6   Plaintiff also reported that she had not used alcohol for the past ten years. AR 475-476.  During

7   the assessment, Plaintiff had normal speech and interaction, was fully oriented, and had intact

8   memory.  AR 476.  She could concentrate on mathematical calculations and verbal and visual

9   demands.  AR 476.  On good days, Plaintiff noted that she does chores such as washing dishes,

10  vacuuming, sweeping, doing laundry, cooking, and shopping. AR 477.  Plaintiff was able to recall

11  seven digits going forward and three digits going backwards. Dr. Castillo was unable to identify

12  any significant mental limitations and diagnosed Plaintiff with major depressive disorder by

13  history, and alcohol abuse by history, in full-sustained remission.  He assessed her GAF at 77. AR

14  477, 478.

15       The VAMC Mental Health Clinic performed a multi-disciplinary assessment of April 27,

16  2004.  AR 553-557.  Dr. Reckford referred Plaintiff for evaluation due to her depression.  AR 554.

17  Plaintiff was no longer taking Paxil because she had a seizure.  AR 554.  Plaintiff reported

18  drinking heavily in 1991 when going through a divorce. AR 554.  She also reported that she had

19  tried just about every drug in her teenage years.  AR 554.  Plaintiff stated that her sister had

20  physically and sexually abused her as a child.  AR 557.  Plaintiff reported that she slept eight

21  hours a night and napped one to two hours a day.  AR 558. Plaintiff was diagnosed with

22  depression.  AR 558.  She was assigned a GAF of 55 by Nadine Shirley, L.C.S.W., and was

23  referred for a psychiatric evaluation.  AR 558.  Plaintiff began seeing Ms. Shirley for counseling

24  in April 2004.

25

26

27        [4] A GAF between 41 and 50 "is characterized by serious symptoms (e.g. suicidal ideation, severe
    obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g.

28  no friends, unable to keep a job)."  DSM-IV at 32.

1    On May 13, 2004, Dr. Paul Malarik, M.D., Plaintiff's psychiatrist, reported that Plaintiff's
2  mood was euthymic and assigned a GAF of 65.  AR 549.  He prescribed Celexa.  AR 550.

3    On June 15, 2004, Plaintiff presented with tearfulness in her counseling session with
4  Nadine Shirley. AR 543.   She discussed childhood abuses and identified current stressors which
5  included her husband's health and her son's incarceration.  AR 543.  Plaintiff indicated that she
6  was not ready to attend group sessions as previously recommended. AR. 544.  On July 19, 2004,
7  Plaintiff's counseling session focused on recounting in detail her experience of being buried in a
8  building which had occurred five years ago.  AR 541. Plaintiff made statements like "Life is so
9  unfair."  Plaintiff was given a GAF of 60.  AR 542.  On August 5, 2004, Plaintiff's concerns
10 focused on her youngest son who was in jail and her husband who was doing well since his leg
11 amputation. Ms. Shirley observed that Plaintiff was much calmer than her last visit.   AR 538-40.

12   On September 3, 2004, Plaintiff was evaluated by Dr. Malarik, her psychiatrist, again.  She
13 was still experiencing depression and was trying to increase her prescription for Celexa.  AR 532.
14 A mental status exam revealed feelings of hopelessness, sleep disturbances, fair engagement, a
15 constricted affect and a depressed mood. , AR 532.  Dr. Malarik, diagnosed depressive disorder
16 and assessed Plaintiff's GAF at 60.  AR 533.   He increased Plaintiff's Celexa to twenty
17 milligrams per day. 533.  At a follow-up on October 1, 2004, Dr. Malarik noted that Plaintiff was
18 doing well.  He assessed Plaintiff's GAF at 60.  AR 523-524.

19   On November 4, 2004, Ms. Collins was evaluated by psychologist Robert Hall to
20 determine whether she was psychologically stable to undergo elective gastric bypass surgery.  AR
21 511 513.  He noted significant family stressors, diagnosed her with depression, and gave her a
22 GAF of 65.  AR 513.  He would not release her for surgery until she could demonstrate restraint
23 with her eating and increase her exercise. AR 513.

24   At a counseling session with Ms. Shirley on November 17, 2004, Plaintiff was
25 overwhelmed by life's responsibilities as a care giver.  AR 677.  She admitted having thoughts of
26 suicide by driving her car off of a bridge.  AR 677.  She agreed that she would call 911 or her
27 counselor  if those thoughts were to reoccur with the same intensity.  AR 677.   On January 24,
28 2005, Ms. Shirley noted that Plaintiff was more relaxed.  AR 656.

On February 14, 2005, at another follow-up appointment with Plaintiff's psychiatrist, Dr. Malarik, Plaintiff reported increased stress including the recent hospitalization of her husband. AR 645.  The examination revealed sleep disturbance, fair engagement, a euthymic affect, and a fair mood.  AR 645.  He diagnosed Plaintiff with depression and assigned Plaintiff a GAF of 60. AR 645-646.  On February 28, 2005, Plaintiff was in much better spirits at a session with Ms. Shirley. AR 635.

On May 7, 2005, while at the VAMC Extended Care Facility for fibromyalgia pain control, Plaintiff became verbally abusive toward staff and nurses insisting that her food be served in her room as opposed to the dining room.  AR 601-602.   She began to put on a "show" which involved her dancing, crawling out of the elevator, and "going on tirades."  AR 603.  Plaintiff left the ward with her belongings without being discharged.  AR 591.  Plaintiff requested readmission but readmission was not authorized due to Plaintiff's behavior.  AR 591-592.  As a result, attending physician Bannout recommended psychiatric evaluation.  AR 603.

On May 9, 2004, Plaintiff's husband requested that Plaintiff be seen by Ms. Shirley because Plaintiff had become violent and she was currently acting like a child.  AR 601.  When recounting her experience at the extended care facility, Plaintiff told Ms. Shirley that she had been told to eat in the cafeteria instead of her room at the facility. AR 602.  Plaintiff stated that she wanted to do something that would change things on the Veteran's behalf.  AR 602.   Plaintiff followed the nurses around and made comments about the way they were caring for the patients. AR 602.  Ms. Shirley observed that although Plaintiff was having some physical difficulties, her mental condition was the same it had been in the past.  AR 602.

On May 13, 2005, Plaintiff was seen by Dr. Reckford, M.D., for difficulty breathing and chronic pain and weakness.  AR 597.  Plaintiff reported that she was taking her husband's Percocet in addition to Vicodin because her pain medicine was inadequate.  AR 597.  Her speech was pressured and she was much more talkative than usual.  AR 597. Dr. Reckford noted that Plaintiff's demeanor had changed and appeared to be in hypomanic state.  AR 599.  Dr. Reckford was not sure whether Plaintiff's condition was caused by psychiatric influences or other factors. AR 600.  He noted the steroids Plaintiff was taking may be playing a role.  AR. 599.  Dr.

1  Reckford told Plaintiff to stop taking Baclofen and Temazepam.  AR 600.  Plaintiff was also

2  advised not to take Vicodin and Percocet.  AR 600.

3      ALJ's Findings

4      The ALJ determined that Plaintiff had not engaged in substantial gainful activity since July

5  26, 2001.  AR 34.  The ALJ also found that Plaintiff suffers from severe obesity, fibromyalgia,

6  depression, asthma, back strain, and mild cardiomegaly, but that she does not have an impairment

7  or combination of impairments set forth in the Listing of Impairments.  AR 34.

8      The ALJ found that the Plaintiff was not credible.  He commented on several

9  inconsistencies in Ms. Collin's statements regarding her medical conditions, her ability to do

10 activities of daily living, her level of pain, the reasons she stopped working, and her previous drug

11 use.  AR 29-31.  The ALJ also noted that Plaintiff had not been compliant in following a

12 treatment regimen including failing to quit smoking and not exercising.  AR 29-31.  The ALJ

13 acknowledged that Plaintiff suffers from depression but her condition had improved with

14 treatment.  Although Plaintiff stated she had been arrested, had been diagnosed with bipolar

15 disorder, and had been hospitalized pursuant to a 5150 hold, none of the records were submitted.

16 AR 31.[5]  Finally, the ALJ rejected the medical opinions of Plaintiff's treating physician and two

17 state agency examining physicians, as well as the opinion of two consulting psychologists.  AR 32.

18 Instead, the ALJ relied on the opinion of a state agency psychiatrist.  AR 32.

19     Based on the above, the ALJ found that Plaintiff had a residual functional capacity

20 ("RFC") to perform the physical exertion and nonexertional requirements for work except that she

21 can lift and carry up to twenty pounds occasionally and ten pounds frequently, she can stand and

22 walk up to six hours in an eight-hour workday, she cannot climb ladders or scaffolds, she can

23 climb stairs occasionally, she must avoid unprotected heights and moving machinery, she must

24 avoid excessive exposure to dust, fumes, smoke, and other respiratory irritants, and she can

25 perform tasks that require only simple instructions.  AR 34.

26

27      [5] Although Plaintiff did not submit records to the ALJ, Plaintiff did submit additional medical and
psychological records regarding her psychological and medical conditions to the Appeals Council.  AR 706, 717-
28 854.

1    Given this RFC, the ALJ found that Plaintiff could not return to her past work. AR 34.

2    Nevertheless, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in

3    the national economy including an assembler, a sewing machine operator, and a hand packer.

4    Accordingly, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act.

5    AR 35.

6    **SCOPE OF REVIEW**

7    Congress has provided a limited scope of judicial review of the Commissioner's decision

8    to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

9    the Court must determine whether the decision of the Commissioner is supported by substantial

10    evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

11    *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

12    *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

13    reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.

14    The record as a whole must be considered, weighing both the evidence that supports and the

15    evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995

16    (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the

17    proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court

18    must uphold the Commissioner's determination that the claimant is not disabled if the Secretary

19    applied the proper legal standards, and if the Commissioner's findings are supported by

20    substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

21    Cir. 1987).

22    **REVIEW**

23    In order to qualify for benefits, a claimant must establish that he is unable to engage in

24    substantial gainful activity due to a medically determinable physical or mental impairment which

25    has lasted or can be expected to last for a continuous period of not less than twelve months.  42

26    U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

27    such severity that he is not only unable to do her previous work, but cannot, considering his age,

28    education, and work experience, engage in any other kind of substantial gainful work which exists

1   in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The

2   burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir.

3   1990).

4          In an effort to achieve uniformity of decisions, the Commissioner has promulgated

5   regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

6   C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f).  Applying this process in this case, the ALJ found that

7   Plaintiff: (1) had not engaged in substantial gainful activity since July 2001; (2) has an impairment

8   or a combination of impairments that is considered "severe" based on the requirements in the

9   Regulations (20 CFR §§ 416.920 (c); (3) does not have an impairment or combination of

10  impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P,

11  Regulations No. 4; (4) cannot perform her past relevant work yet, (5) can perform a significant

12  numbers of jobs in the national economy. AR. 22, 32, 33.

13         Here, Plaintiff argues that the ALJ's findings are erroneous for several reasons.  First,

14  Plaintiff argues that the ALJ improperly rejected the opinion of Plaintiff's treating physician Dr.

15  Reckford, and consultative physicians Dr. Wood, and Dr. Modi.  Second, Plaintiff argues that the

16  ALJ erred by rejecting the mental function opinions of treating psychiatrist Dr. Malarik, treating

17  counselor Shirley, and consultative psychologists Kjelson and Cushman.  Finally, Plaintiff argues

18  that the ALJ erred in finding Plaintiff's obesity to be legally severe but then failed to incorporate

19  consideration of that impairment into his RFC finding.

20                                      **DISCUSSION**

21  **A**.       **Rejection of Treating and Examining Doctor's Opinions**

22  **1.**       **The Law**

23         The opinions of treating doctors should be given more weight than the opinions of doctors

24  who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v.*

25  *Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not contradicted

26  by another doctor, it may be rejected only for "clear and convincing" reasons supported by

27  substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating doctor's opinion is

28  contradicted by another doctor, the ALJ may not reject this opinion without providing "specific

1   and legitimate reasons" supported by substantial evidence in the record. *Id.* (quoting *Murray v.*

2   *Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out a detailed and

3   thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof,

4   and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must do

5   more than offer his conclusions.  He must set forth his own interpretations and explain why they,

6   rather than the doctors' are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

7          In *Orn v. Astrue,* 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit reiterated and expounded

8   upon its position regarding the ALJ's acceptance of the opinion of an examining physician over

9   that of a treating physician.  "When an examining physician relies on the same clinical findings as

10  a treating physician, but differs only in his or her conclusions, the conclusions of the examining

11  physician are not '"substantial evidence."'  *Orn,* 495 F.3d at 632; *Murray,* 722 F.2d at 501-502.

12  "By contrast, when an examining physician provides 'independent clinical findings that differ

13  from the findings of the treating physician' such findings are 'substantial evidence.'" *Orn*, 496

14  F.3d at 632; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985).  Independent clinical findings

15  can be either (1) diagnoses that differ from those offered by another physician and that are

16  supported by substantial evidence (*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.1985)), or (2)

17  findings based on objective medical tests that the treating physician has not herself considered

18  (*see Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)).

19         If a treating physician's opinion is not given controlling weight because it is not well

20  supported or because it is inconsistent with other substantial evidence in the record, the ALJ is

21  instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6) in

22  determining what weight to accord the opinion of the treating physician.  Those factors include

23  the "[l]ength of the treatment relationship and the frequency of examination" by the treating

24  physician; and the "nature and extent of the treatment relationship" between the patient and the

25  treating physician.  20 C.F.R. 404.1527(d)(2)(i)-(ii).  Other factors include the supportablility of

26  the opinion, consistency with the record as a whole, the specialization of the physician, and the

27  extent to which the physician is familiar with disability programs and evidentiary requirements.

28  20 C.F.R. § 404.1527(d)(3)-(6).  Even when contradicted by an opinion of an examining

physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to deference." SSR 96-2p; *Orn, 495 F.3d at 632-633*. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p; *Orn, 495 F.3d at 633*.

**2. Discussion**

*a. Dr. Reckford*

Plaintiff's treating physician at the VAMC, Dr. Reckford, M.D., supplied the following letter :

> Ms. Sandra Worstall is a patient with multiple medical problems leading to disability and inability to work. Over the past several months she has been seen for several exacerbations of asthma and chronic lung disease, leading to severe limitation in exercise tolerance due to shortness of breath, even with minimal activity. On recent cardiopulmonary testing, oxygen therapy was recommended with activity and at nights. Recurrent pulmonary infections have complicated the problem. Ms. Worstell's medical history also include[s] chronic neck and back pain which have affected her ability to engage in tasks such as lifting, bending, climbing, etc. X-ray has shown cervical degenerative changes.
>
> Due to a diagnosis of seizure disorder, we have advised that she does not operate a motor vehicle. Her medical condition is further complicated by obesity, hypertension, and diabetes requiring medications. Frequently she has been bothered by severe headaches, possibly migraines. She has had poor concentration and sleep disturbances (hyponeic episodes on sleep study) as well as insomnia likely to worsened by longstanding depression, for which she is taking antidepressants. Recently, she was seen by a psychiatrist for long term care. In my opinion, Mrs. Worstall would not be employable at this time due to the combined effects of chronic psychiatric and medical problems on her functional ability.
> AR 419.

In rejecting Dr. Reckford's opinion, the ALJ indicated the following :

> I give little weight to Dr. Reckford's opinion. In June 2004, the claimant was cleared to drive an automobile again. A determination of disability is not based solely on diagnosis. Unless the claimant's frequent office visits, hospitalizations, and emergency room visits are shown to be related to severe impairments, the fact that such visits were made is not sufficient for a determination of disability. Although Dr. Reckford stated that the claimant was frequently bothered by severe headaches, the treatment records show no referral to a neurologist, and improvement after the claimant stopped taking temazpam. Dr. Reckford advised the claimant to engage in weight training, which the claimant did not do. The claimant continues to smoke cigarettes. Dr. Reckford neglected to mention how the claimant follows very little of his treatment advice. There is no indication that Dr. Reckford has expertise in the field of vocational rehabilitation. His statements about employability are outside of his expertise.
> AR 32.

As a preliminary matter, the ALJ correctly notes that diagnosis alone is not sufficient proof of a disability. AR 34. *Matthews v. Shalala*, 10 F. 3d 678, 680 (9th Cir. 1993) (mere existence of a

1    diagnosis is insufficient proof of a disability); *Sample v. Schweiker*, 694 F. 2d 639, 642-643 (9th

2    Cir. 1982) (same).   Further, the ALJ also properly notes that the Plaintiff was cleared to drive an

3    automobile and that Plaintiff's headaches had subsided and no referral to a neurologist was made.

4    AR 545, 564.  However, the ALJ's rejection of the treating physician's opinion is not supported

5    by substantial evidence for the following reasons.

6          First,  the ALJ notes that visits to the hospital and emergency visits alone are not sufficient

7    for a determination of disability.  AR 32.   However, in this instance, the ALJ had indicated that

8    the Plaintiff suffered from obesity, fibromayalgia, depression, asthma, and back strain which he

9    himself identified as severe impairments. AR 22.

10         Second, although Plaintiff listed headaches on her disability application, the central basis

11   of Plaintiff's disability claim did not involve her headaches, but a myriad of other conditions. AR

12   128, 190-196, 420-435, 564, 549-550, 553-557, 632, 679.   Therefore, the ALJ erred in isolating

13   this one condition as a basis to reject the treating physician's opinion.

14         Third, the ALJ discounted the opinion because Plaintiff did not follow the prescribed

15   treatment to stop smoking and to get some exercise.  AR 29, 538, 552, 560, 619.  However, before

16   denying benefits because of a failure to follow a prescribed treatment to quit smoking, an inquiry

17   must be conducted into the circumstances surrounding the failure and a determination must be

18   made whether following the treatment advice will restore Plaintiff's ability to work or sufficiently

19   improve her condition.  20 C.F.R. §§ 404.1530(a), 416.930(a).[6]  *See*, *Shramek v. Apfel*, 226 F. 3d

20   809, 812 -13 (7th Cir. 2000) (overturning ALJ's adverse credibility assessment for claimant's

21   purported failure to comply with the prescribed medical treatment for failing to quit smoking

22   without a finding that claimant's ability to work would be restored if she quit smoking); *Burnside*

23   *v. Apfel*, 223 F. 3d 840, 843-844 (8th Cir. 2000) (noting that before denying benefits based on a

24   failure to quit smoking, an inquiry must be made into the circumstances surrounding the failure

25   and whether quitting smoking will restore an individual's ability to work).   No such inquiry was

26

27          [6] Although Defendant argues that this regulation only applies after a person is found to be disabled, the
      plain language of regulation suggests otherwise and Defendant has not provided any authority in support of that
28    proposition.

1   made in this case.  Similarly, a claimant's failure to lose weight is not a proper basis to deny

2   benefits.  *See*, *Orn v. Astrue*, 495 F. 3d at 636. (ALJ improperly rejected Plaintiff's testimony

3   because he failed to lose weight noting that before a failure to follow prescribed treatment for

4   obesity can become an issue, an individual must be found to be disabled because of obesity or a

5   combination of obesity and another impairment).

6       Defendant has cited to *Bray v. Astrue*, 554 F. 3d 1219, 1227 (9th Cir. 2009)  and argues

7   that the ALJ properly considered the fact that Plaintiff did not quit smoking when rejecting Dr.

8   Reckford's opinion.  In *Bray*, the Ninth Circuit upheld an ALJ's credibility determination when

9   the ALJ relied on the Plaintiff's failure to quit smoking was one of five reasons the ALJ found

10  Plaintiff not credible.  The so doing, the Court noted that Plaintiff may have not been able to quit

11  smoking because of an addiction and there were four other bases on which the ALJ relied.  The

12  Court stated, "the ALJ's reliance on Bray's continued smoking even if erroneous, amounts to

13  harmless error."  *Id*.  This is not clear authority that the ALJ properly discounted the treating

14  physician's opinion based on a failure to quit smoking.  To the contrary, it suggests that an inquiry

15  into the Plaintiff's failure to follow treatment advice should be made.

16      Finally, the ALJ properly noted that Dr. Reckford is not a vocational expert, and that to a

17  large extent, the opinion only listed diagnoses. A.R. 32.  However, Dr. Reckford also indicates

18  that Plaintiff is not employable due to the "combined effects of chronic psychiatric and medical

19  problems on her functional ability."  This statement implies that Plaintiff has limitations caused

20  by her medical and psychological conditions.  AR 419.  The lack of specificity does not constitute

21  a ground to reject the opinion.  Because Dr. Reckford is a treating physician, the ALJ had an

22  obligation to conduct a further inquiry before discounting the letter.  20 C.F.R. § 416.912(e);

23  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requirement to recontact treating source

24  triggered when the evidence from the treating medical source is inadequate to make a

25  determination as to the claimant's disability."); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th

26  Cir.2001) (holding that ALJs have a duty fully and fairly to develop the record when the evidence

27  is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence); *Smolen*

28  *v. Chater*, 80 F. 3d 1273, 1288 (9th Cir. 1996) (explaining that the ALJ had a duty to "conduct

1   appropriate inquiry" if he needed to know the basis of the treating physician's opinion).  Given

2   that Dr. Reckford had been treating Plaintiff for at least a year at the time the opinion was

3   rendered, the ALJ should have inquired in more detail about the bases of the doctor's opinion

4   prior to rejecting it.

5       *b.   Dr. Wood and Dr. Modi*

6           Dr. Wood and Dr. Modi, state agency examining physicians, found that Plaintiff

7   was limited to sedentary work.  Because both of these doctors are examining physicians, their

8   reports can only be rejected if contradicted by another doctor for specific and legitimate reasons

9   that are supported by substantial evidence in the record.  *Lester v. Chater*, 81 F.3d 821, 830-831

10  (9th Cir. 1995) (citations omitted) (the opinion of an examining doctor, even if contradicted by

11  another doctor, can only be rejected for specific and legitimate reasons that are supported by

12  substantial evidence).

13          In rejecting these opinions, the ALJ noted the following:

14          The assessments of the State Agency physicians are based on the findings of Dr.
            Modi and Dr. Wood.  However, Dr. Modi's clinical findings show limitations that
15          Dr. Wood did not find.  Dr. Wood stated that the claimant could only stand/walk
            up to two hours in an eight-hour workday, despite finding the claimant to have a
16          full range of motion in all joints [sic].  Despite the claimant's use of oxygen, she is
            able to walk one-half mile before becoming short of breath.  Therefore, less weight
17          is given to these assessment, as they are also not consistent with the treatment
            record.
18          AR 32.

19          In this case, the ALJ failed to identify the inconsistencies in the reports.  In fact, the ALJ

20  does not mention Dr. Modi's evaluation again other than noting "these assessments" are not

21  consistent with treatment record. AR 32.  Defendant supports the ALJ's decision by arguing that

22  there were inconsistencies between the two reports regarding Plaintiff's motor strength and

23  function.  However, the ALJ did not explicitly make these findings and as such the Court cannot

24  consider them.  "[The court] cannot affirm the decision of an agency on a ground that the agency

25  did not invoke in making its decision."  *Stout v. Comm'r*, 454 3d 1050, 1054 (quoting *Pinto v.*

26  *Masssanari*, 249 F. 3d 840, 847 (9th Cir. 2001).  The ALJ must more clearly define the reasons for

27  discounting these doctors' opinions in order to meet the substantial evidence standard.

28

1  Similarly, the ALJ's rejection of Dr. Wood's assessment that the Plaintiff could only

2  stand/walk up to two hours in an eight hour workday because plaintiff had full range of motion

3  and she was able to walk a half mile despite her use of oxygen is also insufficient.  AR 32, 190.

4  Although Defendant argues that the ALJ properly interpreted the evidence, the ALJ must give a

5  *legitimate* reason for his interpretation.   Here, the reason is not legitimate because the ability to

6  walk half a mile, or finding that Plaintiff had full range of motion is not inconsistent with the

7  doctor's opinion that Plaintiff can stand or walk no more than two hours a day.  AR 32.

8       c.    *Dr. Kjelson and Dr. Cushman*

9  In rejecting the opinions of Dr. Kjelson, Plaintiff's examining psychologist, and Dr.

10  Cushman, the Social Security Administration consultative psychologist, the ALJ merely states the

11  following:

12  > Little weight is given to the assessments of Dr. Kjelson and Dr. Cushman.  As
     > shown above, the statements to Dr. Kjelson are inconsistent with the medical

13  > records.  The claimant's treating sources found the claimant to be much less
     > limited.  I give greater weight to the assessment of Dr. Castillo, as it is more

14  > consistent with the treatment record.
     > AR 32

15

16  Here, the ALJ's decision lacks specificity as he did not identify what inconsistent

17  statements he was referring to.  The court assumes that the inconsistent statements the ALJ relies

18  upon is that Dr. Kjelson diagnosed post-traumatic stress disorder based on the Plaintiff's reports

19  that she had broken her neck when a building collapsed on her. AR 30. The ALJ indicates that

20  there is no evidence that Plaintiff was severely injured as evidenced by the lack of a fracture on

21  the MRI scan.  AR 30.  However, whether Plaintiff broke her neck is not the only evidence of a

22  serious injury, or determinative of diagnosis of post traumatic stress disorder.  Further, although

23  the ALJ indicates that the Plaintiff's treating sources found her to be much less limited, he did not

24  identify which doctors he was referring to, or what the limitations were.  This is not a detailed

25  summary of the conflicting clinical evidence, or an explanation of the ALJ's interpretation that

26  meets the substantial evidence test. *Magallanes  v. Bowen*, 881 F.2d at 751.

27  ///

28  ///

d.      *Nadine Shirley, Treating Social Worker, and Dr. Malarik, M.D.,*
        *Treating Psychiatrist*

Plaintiff complains that the ALJ did not address the significance of GAF assessments by treating psychiatrist Dr. Malarik, M.D., and treating social worker Shirley, L.S.C.W.[7]  He argues that each of these practioners assessed Plaintiff's GAF at either 55 or 60 but never higher.  A GAF of 55 or 60 is indicative of moderate limitations in social and/or occupational functioning.  Therefore, the ALJ committed error by ignoring this evidence.

As a preliminary matter, Ms. Shirley is a licensed clinical social worker and, is not an "acceptable medical source."  20 C.F.R. §§ 404.1513(a), 416.913(a).  Instead, she is considered to be an "other source" whose opinion the ALJ may give less weight than that of an acceptable medical source.  20 C.F.R. §§ 404.1513(d), 416.913(d); *Gomez v. Chater*, 74 F.3d 967, 970-71 (9th Cir. 1996).  Although there are exceptions to this rule, such as when a treating physician adopts the opinion of an unacceptable medical source or when the unacceptable source works closely with a physician, they are not applicable here.  *Polny v. Bowen*, 864 F.2d 661, 662-664 (9th Cir. 1988); *Gomez c. Chater*, 74 F.3d 967 (9th Cir. 1996).

Moreover, a GAF score is a generalized description of the claimant's level of psychological symptoms.  *See, DSM-IV* at 32 (4th Ed.  2000) (DSM IV).  The Commissioner has determined the GAF scale "does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings."  65 Fed.Reg. 50,746, 50,765 (Aug. 21, 2000).  In this case, neither Dr. Malarik or Ms. Shirley made more specific findings other than to access the GAF score.  Their failure to make more specific findings meant the opinion was not entitled to deference.  *Morgan v. Comm'r*, 169 F. 3d 595, 601 (9th Cir. 1999) (where a doctor identifies symptoms that might limit a claimant's ability to work, but does not explain how her symptoms translate into specific functional deficits which preclude work activity, the opinion is not entitled to deference).  Accordingly, the ALJ did not error in failing to consider the GAF scores offered by these practioners.

---

[7] Plaintiff also argues that the ALJ improperly discounted Dr. Cushman and Dr. Kjelson's GAF scores and opinions, however the ALJ's treatment of these psychologists have already been addressed above.  *See*, sec. c *supra*.

**B.      Obesity And RFC**

Plaintiff argues the ALJ erred by failing to incorporate consideration of Plaintiff's obesity into his RFC finding.  Defendant responds that the ALJ found that obesity was a severe impairment and that he considered this factor in combination with Plaintiff's other impairments and limited Plaintiff's range of light work accordingly.  Defendant also contends that Plaintiff's claim has not been preserved for purposes of appeal because she has failed to identify or demonstrate how her obesity caused limitations greater than those found by the ALJ.

**1.      Discussion**

Plaintiff relies on *Celaya v. Halter*, 332 F.3d 1177, 1182 (9th Cir. 2003) in support of her position.  However, this matter is distinguishable from *Celaya*.  There, the Ninth Circuit reasoned that the ALJ should have considered the claimant's obesity as a disabling factor, even where it was not expressly argued by the claimant, because obesity was raised impliedly in Celaya's report of symptoms, it was clear that Celaya's obesity was close to the listing criterion and was a condition that could exacerbate her reported illness, and Celaya was proceeding pro se and thus the ALJ had a duty to develop the record regarding her obesity.  *Celaya v. Halter*, 332 F.3d at 1182.

Significantly, unlike the claimant in *Celaya*, Plaintiff was represented by counsel.  The fact that Plaintiff is morbidly obese is noted by several physicians, but none specifically indicated that Plaintiff's obesity adds to her limitations. AR 190, 564, 632, 679.  Additionally, other than making the broad assertion that the ALJ failed to incorporate obesity into his RFC finding, Plaintiff failed to identify evidence in the record in support of this conclusion.

In *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005), the Court of Appeals pointed out that a Plaintiff must demonstrate or identify evidence of "functional limitations as a result" of obesity.  *Id.*, at 684.  Like the claimant in *Burch*, Plaintiff has failed to point to any evidence of her obesity causing functional limitations.  Although Plaintiff identified asthma, depression, back pain and edema as reasons for her inability to work, she presented no testimony that her obesity impaired her ability to work or that it affected her daily activities in any way.  AR 864-919.

1    In sum, the ALJ recognized Plaintiff's obesity as a severe impairment.  AR 34.  However,

2  the ALJ also modified the RFC.  He found that the Plaintiff has a residual functional capacity

3  ("RFC") to perform the physical exertion and nonexertional requirements for work except that she

4  can lift and carry up to twenty pounds occasionally and ten pounds frequently, she can stand and

5  walk up to six hours in an eight-hour workday, she cannot climb ladders or scaffolds, she can

6  climb stairs occasionally, she must avoid unprotected heights and moving machinery, she must

7  avoid excessive exposure to dust, fumes, smoke, and other respiratory irritans, and she can

8  perform tasks that require only simple instructions.  AR 32, 34.  Plaintiff failed to identify how

9  her obesity caused limitations greater than those found by the ALJ.

10                                          **REMAND**

11    Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

12  power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

13  or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

14  In social security cases, the decision to remand to the Commissioner for further proceedings or

15  simply to award benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d

16  599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original

17  administrative proceedings, a social security case should be remanded.  Where, however, a

18  rehearing would simply delay receipt of benefits, reversal and an award of benefits is

19  appropriate."  *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859

20  F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no

21  useful purpose would be served by further administrative proceedings, or where the record has

22  been thoroughly developed.").

23    Here, the Court finds that remand for further proceedings is proper to allow the ALJ to

24  properly review all of the medical and psychological evidence as outlined above.

25                                        **CONCLUSION**

26    Based on the foregoing, the Court finds that the ALJ's decision is not supported by

27  substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

28

1  further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

2  judgment in favor of Plaintiff Sandra Collins and against Defendant Michael J. Astrue,

3  Commissioner of Social Security.

4

5      IT IS SO ORDERED.

6  **Dated:**    **September 22, 2009**                   **/s/ Gary S. Austin**
                                                UNITED STATES MAGISTRATE JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28